THE PEOPLE OF THE STATE OF NEW YORK ex rel. WILLIAM P. THOMAS, in Behalf of HYMAN MECHENHOLTZ, Hereinafter Called the " Prisoner," Relator, v. JOHN J. HANLEY, Sheriff of Bronx County, Defendant.

Supreme Court, Special Term, Bronx County, October 8, 1936.

*Carlino, Thomas & Murphy* [*William P. Thomas* and *Benjamin Zeche* of counsel], for the relator.

*Frank McHugh* [*Edward M. Edenbaum* of counsel], for the defendant.

COTILLO, J. The prisoner Hyman Mechenholtz was married on June 15, 1930, and thereafter various matrimonial disputes arose between him and his wife, with the result that the wife commenced an action for absolute divorce in Kings County Supreme Court, which action, though undefended, was withdrawn from the calendar by the plaintiff when it became evident that the husband, fearing alimony would be awarded, indicated his intention to defend.

Upon a discontinuance or withdrawal of the action, which had been commenced in 1932, the husband left for Arkansas and thereafter obtained in that State a decree of absolute divorce which, he was informed by his Arkansas lawyer, would be recognized in every State in the Union excepting in New York.

During the time he was in Arkansas the wife obtained a warrant in the New York City Domestic Relations Court for non-support.

This warrant could only be executed within the city of New York. For some unexplained reason the warrant officer who was intrusted with the warrant not only went outside the city of New York to execute it, but, further, went to Jersey City in New Jersey, where the husband was at that time residing. The husband, after being informed by the judge before whom he was brought in New Jersey that he was not under indictment and could not be compelled to leave the State of New Jersey, nevertheless voluntarily returned with the warrant officer. This he claims he did because, believing he was divorced, he felt that no harm could come to him in the State of New York. He was, however, arraigned before the magistrate in the Court of Domestic Relations, who, after listening to the stories of the husband and wife, ordered the husband to pay five dollars per week and post a bond in the amount of $500. This low amount of payment was evidently arrived at by the court in view of the fact that there are no children of the marriage. But, unable to post the bond, he was then confined to the workhouse on Riker's Island, where he was hospitalized for a cardiac condition. While he was in the workhouse his wife obtained on March 1, 1935, an order of arrest upon an uncorroborated affidavit in which she swore that the husband intended leaving the jurisdiction of the State.

Upon these papers an *ex parte* order of arrest was issued. His term in the workhouse for failing to post a bond had expired on May 12, 1935, which fell upon a Sunday. If he had been held until the expiration of his term the plaintiff would have been unable to serve process on him when he was being discharged. He, however, was discharged on May 11, 1935, which was a Saturday, and as he was getting off the boat from Riker's Island he was met by the sheriff of Bronx county, who served him with a summons and complaint and an order of arrest which permitted his release only upon posting a bond in the sum of $1,500.

*He has been continuously in jail ever since; sixteen and one-half months in the Bronx county jail and six months in the workhouse on Riker's Island for a total of twenty-one and one-half months.* During the time he was in jail an order for alimony and counsel fees *pendente lite* was obtained on default. A judgment for separation was also obtained on default in Brooklyn, and a further bond for $1,500 was directed to be filed by the husband in the judgment to insure payment of increased alimony to the wife. The order for temporary alimony and counsel fee was signed on June 14, 1935. The judgment for permanent alimony was signed on April 3, 1936.

Between the time of his arrest and the present time no motion was made to punish for contempt nor was a motion ever made to enforce the decree of the court. Further testimony adduced before me on the writ of habeas corpus proves it is obvious that the only purpose in not attempting to punish him for contempt is the fact that the wife has evidently been advised that on such a motion the husband might move, under a cross-motion under section 1172-a of the Civil Practice Act, for relief from the unusual predicament in which he now finds himself.

There is no doubt that this is the type of case contemplated when section 1172-a was enacted. His earning capacity has undoubtedly been seriously affected because of, and during his confinement.

On the argument of the writ of habeas corpus, counsel for the wife informed the court in unmistakable terms that she intended to take no such steps to punish; that she was relying upon all technicalities; that the husband had failed to move to vacate the order of arrest within the time specified, and that no relief could be granted to him.

The prisoner has, therefore, been confined due to tactics which however technically correct, unless this court in the exercise of the equity powers of the Supreme Court can afford some relief, will result in the prisoner virtually receiving a life sentence.

His time to move to vacate the order of arrest has long since expired. The only remedy for him is to invoke the aid of a court of equity by a writ of habeas corpus. Letters produced by the husband from the wife and identified by her as in her handwriting indicated that the sole reason for keeping him in jail is to obtain his consent for an absolute divorce so that she can marry someone else.

The wife has shown by her actions and her testimony before me, to be motivated not only by vindictiveness, but also by her desire to obtain her pound of flesh. She also is motivated by a keen desire to take advantage of a present opportunity to remarry. She also seems fearful of losing her rights on the relief rolls. She refused to accept as a condition for releasing her husband the offer of a friend to file a bond guaranteeing payment to her of seven dollars a week.

Our courts and our legal process are not maintained to enable one to secure revenge or work out a spiteful feeling against another. Although the prisoner is at fault in not obeying the orders of the Domestic Relations Court, he nevertheless should not be sentenced to the same term in jail as an habitual criminal. In view of the length of time which has elapsed since any attempt has been made to vacate the warrant, he is condemned to life imprisonment if this court is powerless to aid. Such an incarceration is too severe.

When the husband, at the suggestion of the court, and with the help of his people, offered to post a $50.0 bond and pay the wife seven dollars per week alimony, she refused to take it because she felt that this payment would remove her from the relief rolls. I pleaded personally with the wife in chambers on the vigil of the most important Jewish holiday, Yom Kippur, or Day of Atonement, to accept seven dollars per week, which would be guaranteed by the filing of a bond for a year by a friend.

I emphasized further that there were no children involved and he could never procure a position by being incarcerated; that his physical condition, due to his imprisonment for two years, required her to be considerate and merciful, but my plea was of no avail.

Besides these above facts, Herman T. Radin, M. D., the official physician of the Bronx county jail, has filed an affidavit in which he states that he has had the husband under treatment since May 11, 1935, and that he has found: " During my observation of him, his health has steadily deteriorated. He has lost about twenty pounds of weight. He was very anemic with a pale sallow complexion. His heart action is somewhat feeble and he shows some of the signs of myocarditis. His digestion is greatly impaired; he has chronic constipation and vomits frequently. His appetite is quite poor. He is suffering from lack of sufficient fresh air and normal exercise. His health will steadily decline if his confinement continues."

It, therefore, appears that the prisoner was confined under an order of arrest. The time to vacate same or reduce the amount of the bond expired on May 31, 1935. If he cannot post a bond and if his time to move to vacate the order or reduce the amount of the bond has expired, what is he to do? Stay in jail for the rest of his life while with each week the alimony increases? The court does not agree with the theory presented for the plaintiff, that the Legislature intended that failure to comply with the order of the court as in this case, because of financial ability, should result in life imprisonment. What Civil Practice Commission or what convention of lawyers who recommend these statutes to the legislators, could ever contemplate any such despotic law?

A court can and will always exercise its discretion and equitable power, and will under the facts of each particular case determine whether or not the order is willfully violated. *Though it might appear at times that we have deemed it more important to enact uniform laws governing the subjects of negotiable instruments, sales and other commercial topics, rather than to humanize the procedure for handling domestic troubles, my feeling is that this distinction is, or should be*

*made only more apparent than real.* Upon the state of the home rests the welfare of this nation. This court of equity cannot and will not allow its powers to be usurped by continuing this inhuman treatment of the husband. In this respect, the power of the court is not circumscribed by any specific limitation to which the plaintiff can point; it is inherent and it would be unfortunate if this court of equity did not possess it to the fullest extent. There is no justification to further burden the county with the maintenance of the prisoner when there is no reason to believe that he will ever be able to post a bond. It would be futile to keep him in jail. The law never meant this.

The writ of habeas corpus is sustained and prisoner discharged.